1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Greg Hull / Bar No. 57367
greg@ellenberghull.com
Steve Ellenberg / Bar No. 151489
steve@ellenberghull.com
ELLENBERG & HULL
4 North Second Street, Suite 1240
San Jose, California  95113
Telephone:  (408) 998-8500

Attorneys for Defendant Associated Students
Of the University of California (ASUC)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFEND AFFIRMATIVE ACTION PARTY, et al., | Case No. 4:16-cv-01575 -VC |
| Plaintiffs, | **DEFENDANT ASSOCIATED STUDENTS OF THE UNIVERSITY OF CALIFORNIA'S RESPONSE TO ORDER TO SHOW CAUSE** |
| v. | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, et. al. | |
| Defendants, | |

1

**TABLE OF CONTENTS**

2

**PAGE**

3

I.     QUESTION 1: HAVE ASUC OR ITS OFFICERS ENGAGED IN
4      VIEWPOINT DISCRIMINATION AGAINST DAAP OR ITS MEMBERS
       (AND ASSOCIATED QUESTIONS CONCERNING POSSIBLE
5      DISPARATE TREATMENT AND RELATED EVIDENCE)?............................ 1

6      A.     DAAP Fails to Show that ASUC's Refusal to Waive the Operation of
              ASUC Bylaws Imposed a 'Severe Burden' on DAAP's Free Speech Rights. ........ 1

7
       B.     Even Under A Viewpoint Discrimination Analysis There Was No
8             Constitutional Violation. .......................................................................... 6

9      II.    QUESTION 2: WHAT AUTHORITY, IF ANY, WOULD THIS COURT
              HAVE TO ORDER A NEW ELECTION IN THE EVENT THAT THE
10            PLAINTIFFS SATISFY THE PREREQUISITES FOR PRELIMINARY
              INJUNCTIVE RELIEF?  WHAT OTHER OTHER RELIEF WOULD BE
11            AVAILABLE?............................................................................................. 10

12     A.     The ASUC and the Individual Defendant Members of the ASUC Are
              Not State Actors........................................................................................ 10

13
       B.     Even If the ASUC and Its Members Are State Actors, the Eleventh
14            Amendment Immunizes Them from This Suit in Federal Court............................ 12

15     C.     A Preliminary Injunction Analysis Weighs Heavily Against DAAP. ........ 15

16     III.   QUESTION 3: SHOULD AN INJUNCTION BE LIMITED TO ASUC OR
              ITS OFFICERS?......................................................................................... 17

17
       IV.    QUESTION 4: IS AN EVIDENTIARY HEARING NECESSARY? .................. 17

18
       V.     CONCLUSION ......................................................................................... 18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**PAGE**

3

4

**Cases**

5

*Brown v. City of Pittsburgh,* 586 F.3d 263, 293 (3rd Cir. 2009)..........................................6

*Burdick v. Takushi, 504 U.S. 428, 441* (1992)....................................................................3

6

*Claflin v. Houseman*, 93 U. S. 130, 137 (1876) ................................................................13

7

*Doe No. 1 v. Reed*, 697 F.3d 1235 (9th Cir. 2012) ..........................................................15

8

*Doe v. Lawrence Livermore Nat. Laboratory*, 131 F.3d 836 (1997) ..........................13, 14

9

*Field v. Bowen,* 199 Cal. App.4th 346, 357-359 (2011) ....................................................3

10

*Flint v. Denninson*, 488 F.3d 816 (9th Cir. 2007) ..............................................................2

11

*Hans v. Louisiana,* 134 U.S. 1 (1890) ...............................................................................12

12

*Heffron v. International Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 649
(1981)....................................................................................................................................6

13

*Husain v. Springer*, 193 F.Supp.2d 664 (E.D. NY 2002)................................................12

14

15

*Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995)........................................3

16

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997)..........................................13

17

*Leeds v. Meltz*, 85 F.3d 51 (2d Cir. 1996) ........................................................................12

18

*Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 762 (9th Cir. 1994) ...........................4

19

*Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804,
(1984)....................................................................................................................................6

20

*Munaf v. Geren,* 553 U.S. 674, 689-690 (2008)................................................................15

21

*Rubin v. City of Santa Monica*, 308 F.3d 1008, 1013-1014 (9th Cir. 2002) ......................2

22

*Schrader v. Blackwell,* 241 F.3d 783, 790 (6th Cir. 2001).................................................3

23

*Sellman v. Baruch College of City University of New York*, 482 F.Supp. 475
(S.D.N.Y. 1979)..................................................................................................................11

24

*Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986)..........................3

25

*Thomas v. Chicago Park District,* 534 U.S. 316, 325 (2002) ............................................6

26

27

*Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 363 (1997).................................2

28

*Villegas v. Gilroy Garlic Festival Association,* 541 F.3d 950 (2008)..............................10

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)..................................................... 7

*Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70 (1989) ....................................... 13

*Winter v. National Resources Defense Council, Inc.* 55 U.S. 7, 21 (2008)...................... 15

**Statutes**

U.S. Const. amend. XI. ................................................................................................... 12

Defendants ASUC and its individual members who are named as Defendants in the instant action welcome the opportunity to address the accusation(s) of discrimination claimed by Plaintiffs (hereafter "DAAP") and its counsel.  As shown below, those accusations are unavailing under the applicable law and unsupported by anything close to credible evidence[1].

The Court correctly found in its April 1, 2016 order (Dkt No. 24) that the Plaintiffs failed to establish a "likelihood of success" let alone a "strong likelihood of success" on the merits of their claims.  The applicable law and facts make that finding even more certain, especially in light of the conclusion of the ASUC 2016 election.

For the Court's convenience, Defendants adopt the four question profile contained in the Order to Show Cause (hereafter "OSC") as the framework for their Response to that Order (hereafter "Response").

**I.      QUESTION 1: HAVE ASUC OR ITS OFFICERS ENGAGED IN VIEWPOINT DISCRIMINATION AGAINST DAAP OR ITS MEMBERS (AND ASSOCIATED QUESTIONS CONCERNING POSSIBLE DISPARATE TREATMENT AND RELATED EVIDENCE)?**

Answer:  None.

**A.      DAAP Fails to Show that ASUC's Refusal to Waive the Operation of ASUC Bylaws Imposed a 'Severe Burden' on DAAP's Free Speech Rights.**

As a threshold matter, the Court's inquiry arises within the context of the Plaintiff's Complaint (Dkt. No. 2; hereafter "Complaint"), which alleges constitutional injury under section 1983 of Title 42 of the United States Code.  We offer here a brief comment on the applicable law and on a crucial distinction the law draws between alleged constitutional injury based on a state restriction on ballot access from injury that allegedly arises from a state restriction on public forum speech.  Stated succinctly, while a strict scrutiny analysis applies in First Amendment public forum jurisprudence, it does not apply to allegations of ballot access restriction(s).  So, while Plaintiffs' section 1983 claims assert broadly worded

---

[1] This brief supplements ASUC's brief filed on April 1, 2016 and the evidence submitted with it.

1    and conclusory allegations of violation (Complaint, ¶s 111-119), they obscure the basic

2    issue before the Court—namely, whether the alleged offending conduct produced any

3    cognizable constitutional injury under the appropriate legal framework.

4         Hence, we answer the Court's first question by suggesting that the law applicable to

5    this question implicates cases involving ballot access and political party designation, not

6    First Amendment public forum jurisprudence. *See Rubin v. City of Santa Monica*, 308 F.3d

7    1008, 1013-1014 (9th Cir. 2002) (rejecting strict scrutiny public forum analysis for

8    candidate designation case and instead applying whether regulation at issue constitutes

9    "severe burden" on free speech rights); *see also, Timmons v. Twin Cities Area New Party,*

10   520 U.S. 351, 363 (1997) ("Ballots serve primarily to elect candidates, not as forums for

11   political expression.").  This is so because the ASUC Bylaw (hereafter "ASUCBL")

12   enforced by the Elections Council here (4202, section 4.4) operated only on the ballot

13   designation of candidates affiliated with DAAP and did not otherwise restrict the ability of

14   such candidates to appear on the ballot or to express their affiliation with DAAP in the

15   campaign for election. *See* Declaration of Aleksander Klimek in Support of Response

16   ("Klimek Decl."), ¶ 6, Exh. C.  Accordingly, Defendants respectfully submit that the issue

17   of "viewpoint neutrality," which Defendants address factually below, more appropriately

18   applies to claims of public forum infringement and the need to support any such

19   infringement with a compelling state interest.  The analytic used by the court in *Flint v.*

20   *Denninson*, 488 F.3d 816 (9th Cir. 2007) and cited by plaintiffs as well as the Court's April

21   1, 2016 Order (Dkt. No. 24) involved, and resolved, a restriction on spending of money in a

22   university student body political campaign, which the court found to be a clear public forum

23   issue and not an issue of ballot access or party designation.  Here then, as discussed below,

24   the proper constitutional analytic asks whether the ASUC's ballot designation rule imposed

25   a "severe burden" on the DAAP candidates' free speech rights. *See Rubin*, 308 F.3d 1008.

26   The answer to that question under the facts and the applicable law is an uncomplicated

27   "No."

28        In ballot access and designation cases, the law is well settled that "[s]tates may, and

DEFENDANT ASSOCIATED STUDENTS OF THE UNIVERSITY OF CALIFORNIA'S RESPONSE TO ORDER
TO SHOW CAUSE                                                                                          2

inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election-and campaign-related disorder." *Timmon,* 520 U.S. at 358.  In fact, whether the alleged violation involves the First Amendment or equal protection or due process under the Fourteenth Amendment, ballot access cases regarding party designation demand the identical analysis.  And reasonable legislative restrictions on candidate party identification are constitutional under that analysis. *See, e.g., Field v. Bowen,* 199 Cal. App.4th 346, 357-359 (2011) (analyzing equal protection and due process claims and finding that barring candidate party identification on ballot for "non-qualified political parties," as defined by statute constitutional).

The United States Constitution grants states "broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986).  And "states have significant authority to regulate . . . the identification of candidates on the ballot."  *Schrader v. Blackwell,* 241 F.3d 783, 790 (6th Cir. 2001).  Further, those contesting such regulations "bear[ ] a heavy constitutional burden." *Id.* at 790-791.

Courts will uphold restrictions that are generally applicable, even-handed and which protect the reliability and integrity of the election process. *Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995).  This is true even when the regulations "have the effect of channeling expressive activities at the polls." *Timmons*, 520 U.S. at 369 (upholding city's "anti-fusion law" prohibiting candidates from appearing as the candidate of more than one party on the ballot) (citation omitted); s*ee also, Burdick v. Takushi,* 504 U.S. 428, 441 (1992) (upholding prohibition of write-in votes on election day where it was otherwise easy for candidates to appear on the ballot).

In addition, a restriction is not considered severe when a candidate enjoys other means of disseminating the desired information.  In *Timmons*, for example, the Supreme Court upheld a law prohibiting candidates from listing more than one party affiliation on the ballot, in part because the party retained great latitude in its ability to communicate its

1    support for that candidate notwithstanding the minor ballot prohibition. *Timmon*s, 520 U.S.

2    at 363.

3           In *Burdick*, the Supreme Court upheld a Hawaii law prohibiting voters from writing

4    in names of candidates on election day, citing as justification the ease of access candidates

5    otherwise had to Hawaii's ballots. *Burdick,* 504 U.S. at 436-437.  Similarly, in *Schrader,* the

6    Sixth Circuit upheld the constitutionality of a regulation that prohibited unrecognized party

7    designations, (such as "Libertarian") because reasonable means existed for a party to

8    become recognized. *Schrader*, 241 F.3d at 790-91.

9           Here, the ASUCBL at issue, ASUCBL 4202, section 4.4, states:

10                  If a party has not filed with the Elections Council by the end of the
                    filing period or if the party is disqualified in relation to the Mandatory

11                  Elections Meeting, then all candidates for that party shall be classified
                    as independents."

12

13   Klimek Decl., ¶ 6, Exh. C.

14          For the 2016 ASUC election, the filing period ended at 5:00 pm, on March 11, 2016.

15   Klimek Decl., ¶ 22.  DAAP missed the deadline (*Id*., at ¶ 23) and under the operation of this

16   rule, and without any action by the Elections Council or other arm or member of the ASUC,

17   the candidates otherwise affiliated with DAAP were identified as "Independent" on the

18   ballot. (*Id*., at ¶ 24).

19          In challenging this ASUC party designation rule, DAAP bears the heavy "burden of

20   showing that [the ASUC] ballot access requirements seriously restrict the availability of

21   political opportunity." *Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 762 (9th Cir.

22   1994).  This burden DAAP cannot meet.

23          First, the rule itself is a reasonable requirement designed to allow for orderly

24   preparation of the ballot. Klimek Decl., ¶s 12-14.  DAAP offers no argument or authority to

25   the contrary.  It's worth noting that if DAAP had followed the companion rule set forth in

26   ASUCBL 4204, section 4.5 and filed a Party Endorsement Form, then this entire exercise

27   would never have come to pass.

28          Second, the ASUCBL at issue imposes only a minimal burden on any political party

that desires to sponsor a candidate or a slate of candidates.  It designates candidates as "independent" on the ballot only if a candidate's party fails to file the Party Endorsement Form and pay the associated fee.

DAAP does not offer any evidence that the rule imposes a "severe" burden on it or on any other party.  Rather it seeks to excuse its failure to take the simple steps required to avoid operation of the rule by casting the Election Council's unwillingness to grant it a waiver as an act of discrimination.  As argued below, this position will not stand scrutiny.

Finally, the minimal burden that the rule did impose on the parties subject to its reach imposed virtually no restriction on "political opportunity," as the evidence teaches. All candidates who desired to affiliate their candidacy with DAAP had ample, alternative means to do so other than the ballot designation.  Thus, all candidates who desired to campaign as DAAP affiliated candidates presumably did so.  And DAAP offers no evidence that the "independent" designation on the ballot prevented any candidate from standing for election on the ballot or from campaigning for election as a DAAP affiliated candidate.  In addition, all DAAP candidates who identified as DAAP affiliated candidates and who chose to do so used the letters "DAAP" as their nickname on the official ballot.  Declaration of Meeri Shin in Support of Response ("Shin Decl."), Exh. E.  Also, all candidates who chose to do so affiliated themselves with DAAP in the official election Voters Guide. Klimek Decl., ¶ 30, Exh. E.  Finally, there is no evidence that the ballot designation prevented or restricted any DAAP affiliated candidate from campaigning vigorously as a DAAP affiliated candidate and/or from explaining to voters, if the need arose, why the "independent" designation would appear next to their name(s) on the ballot.

In sum, DAAP had plenty of opportunity outside of the ballot designation to get its political message heard and disseminated.  Indeed, the *Daily Californian* reported on the 2016 election results and had no problem identifying the DAAP candidate in its story.  *See* http://www.dailycal.org/2016/04/09/student-action-sweeps-4-partisan-executive-seats-gains-senate-majority/ (writing that "Independent presidential candidate James Bacon and Michael Cortez-Mejia, who is affiliated with the Defend Affirmative Action Party, won 344 and 274

votes, respectively" of the thousands of votes cast for the office of president of the ASUC).

### B.     Even Under A Viewpoint Discrimination Analysis There Was No Constitutional Violation.

As is plain from its text, the ASUC ballot party designation rule in question is viewpoint neutral under a viewpoint discrimination analysis. *See, e.g., Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984) (ordinance prohibiting the posting of signs on public property "is neutral—indeed it is silent—concerning any speaker's point of view"); *Heffron v. International Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 649 (1981) (State Fair regulation requiring that sales and solicitations take place at designated locations "applies evenhandedly to all who wish to distribute and sell written materials or to solicit funds").  Here, ASUCBL 4204, section 4.5, obliges all parties to pay a fee and file a party endorsement form and the rule in question, ASUCBL 4204, section 4.4, imposes the same "independent" designation on the candidates of any party that fails to comply with section 4.5, regardless of that party's political viewpoint(s).  Therefore, on its face the rule at issue clearly withstands a viewpoint constitutional review.

Further an "as applied" constitutional challenge to the ASUC rule also fails.  To succeed on such a challenge, DAAP must show that through the application or waiver of the rule, a "pattern of unlawful favoritism appears. . . ." *Thomas v. Chicago Park District,* 534 U.S. 316, 325 (2002) (examining park ordinance stating permitting process for holding large scale events).  To establish a pattern of unlawful favoritism, DAAP must show more than its arguments for a waiver of the rule were rejected.  As explained in *Brown v. City of Pittsburgh,* 586 F.3d 263, 293 (3rd Cir. 2009) an "as applied" challenger must "must prove not merely that the. . . enforcement of the ordinance has tended to fall more heavily on those who advocate one viewpoint . . . than on those who advocate another. . . (the challenger) must also prove that such enforcement occurred because of the viewpoint expressed.  That is, (the challenger) must show an intent to discriminate on the basis of viewpoint."  This requirement, the Third Circuit explained in *Brown,* stems from the Supreme Court's

observation in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989) that " '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Brown,* 586 F.3d at 293 (quoting *Ward*, 491 U.S. at 791).

Under the record before the Court, there simply is no showing of a "pattern of unlawful favoritism" let alone any intent to discriminate against the viewpoint(s) expressed by DAAP or its candidates. The ballot designation about which Plaintiffs' complain was a one-time occurrence and DAAP does not contend that it evidenced a pattern of discrimination stretching back in time over past elections. In fact, DAAP makes a point of saying that it has participated in ASUC elections for many years and does not suggest that it has suffered a continuing pattern of discrimination at the hands of the various student governments that have managed those elections over that time. *See* Klimek Decl., ¶ 25, Exh. D (DAAP Petition to the Judicial Council). Further the ASUC government is by its very nature transitory. Every year ASUC officials change. *Id*., at ¶ 5. A new mixture of student-voters elects ASUC officials every year as students graduate and new students arrive on campus. Hence, there is minimal incumbency and strong mitigation of the potential for continuing institutional bias or prejudice toward any viewpoint.

In addition, the facts and conclusions that Plaintiffs urge on the court as evidence of viewpoint discrimination do not withstand scrutiny. Viewpoint discrimination typically arises in those situations where two persons (or here political parties) stand on the same ground factually and the accused actor treats one differently from the other, thus supporting perhaps some inference of discrimination against the viewpoint(s) held by the one receiving the harsher treatment. Here these factual predicates to viewpoint discrimination do not exist.

The reservoir of evidence offered by the Plaintiffs in support of viewpoint discrimination resides in just two circumstances: the treatment accorded the appeals of CalSERVE, a party in the 2016 election, and of Danielle Miguel, a candidate affiliated with CalSERVE in the 2016 election as juxtaposed against the treatment accorded the DAAP

appeal.  We now address the evidence related to these appeals and claimed to support

viewpoint discrimination.  Initially, it is worth noting for the Court that in its petition to the

Judicial Council, DAAP characterized CalSERVE as a companion-victim of viewpoint

discrimination.  DAAP argued to the Judicial Council that:

> The ASUC Elections Council has implemented an effective ban
> on two of ASUC's longest-running and most respected student
> parties: Defend Affirmative Action Party, and CalSERVE….In
> recent history, both Defend Affirmative Action Party and
> CalSERVE have been the parties to whom most minority
> students have cast their votes.  The Elections Council, by
> inventing the most trivial and meaningless of charges as a basis
> for excluding these parties, harkens back to the old Jim Crow
> days when Southern segregationists used "grandfather clauses,"
> poll taxes, or any other frivolous improvisation to exclude black
> Americans from the ballot box. The Elections Council cannot be
> permitted to reign over a New Jim Crow at UC Berkeley.

*Id.*

As discussed immediately below, this same Election Council, subsequently *accepted*

the appeal of CalSERVE and the appeal of Danielle Miguel, one of CalSERVE's

candidates.  If the Election Council in fact held the malignant, discriminatory attitude

against CalSERVE that DAAP attributed to it, then its decision to *accept* the appeals of

CalSERVE and Danielle Miguel constituted a truly head-snapping reversal of that alleged

discriminatory disposition.  The more plausible conclusion, and the one supported by the

evidence discussed below, is that the Elections Council was not influenced by the

viewpoints of CalSERVE, Ms. Miguel or DAAP on race or any other position but instead

based its decisions on the different facts that obtained in the appeals before it.

DAAP appealed from the consequence of its failure to file a party endorsement form as

required by the ByLaws.  But CalServe and Ms. Miguel appealed from the consequences of

entirely different facts.

In the case of CalSERVE, the appeal did not arise from a failure to file its party

endorsement form.  The appeal arose because the Elections Council questioned the use of

the moniker "Cal" in the name of the party and requested proof from CalSERVE that it had

a current right to use the name on the ballot. Klimek Decl., ¶ 33.  CalSERVE provided the

1   requested proof and, on that basis, its appeal was accepted. (*Id.*).  Importantly, DAAP does

2   not allege that these facts are wrong and, in fact, argues that they are instead the facts in play

3   but were used as a pretext for a "New Jim Crow on UC Berkeley."

4        There is simply no logical or legal pathway here to claim that DAAP and CalSERVE

5   were in the same shoes factually, but were treated differently.  They were not in the same

6   shoes; not even close.  CalServe had complied with ASUCBL 4204, section 4.5 and DAAP

7   did not.

8        In the case of Danielle Miguel, the facts are arguably closer to the facts that constrain

9   DAAP but are still clearly distinguishable.  As the record reflects, Ms. Miguel appealed

10   from the Election Council's decision not to accept her candidate form and payment of the

11   associated fee because they were not timely.  Klimek Decl., ¶ 34.  But Ms. Miguel provided

12   the Elections Council with proof that she had in fact paid the fee and filed the form in a

13   timely manner, namely a receipt for both, as set forth in the Klimek Declaration.  *Id.* Again,

14   Ms. Miguel presented evidence of compliance with ASUCBLs while DAAP did not.

15        In short, the fact that DAAP failed to file its party endorsement form caused the

16   predicament that it faced—nothing else.  DAAP offers only the most general evidence that

17   any member of the Elections Council knew of any particular viewpoint espoused by DAAP

18   or its candidates, and *none* that the Elections Council denied DAAP's appeal on the basis of

19   such viewpoint(s).  The facts offered by DAAP in support of viewpoint discrimination are

20   insufficient to sustain a finding on this issue in DAAP's favor.  There were real, undisputed

21   and viewpoint neutral facts that explain the different treatment that the three appellants

22   received.  Nothing in the record supports a contrary conclusion.

23        Last but importantly, this group of young people hardly supports the inference that

24   DAAP draws here, namely that the Elections Council was hostile to viewpoints that

25   supported racial diversity and sexual and gender safety on campus.  Shin Decl., ¶ 13.

26   /////

27   /////

28   /////

## II.   QUESTION 2: WHAT AUTHORITY, IF ANY, WOULD THIS COURT HAVE TO ORDER A NEW ELECTION IN THE EVENT THAT THE PLAINTIFFS SATISFY THE PREREQUISITES FOR PRELIMINARY INJUNCTIVE RELIEF?  WHAT OTHER OTHER RELIEF WOULD BE AVAILABLE?

Answer:  None.

The ASUC respectfully offers that this Court has no authority to order a new election for multiple reasons.  First, the ASUC is not a state actor and therefore committed no cognizable constitutional violations regarding the election that would justify the injunctive relief sought.  Second, even if this Court were to determine that the ASUC is a state actor, the Eleventh Amendment bars the relief sought by Plaintiffs.  Finally, the record here strongly favors the Defendants on any Preliminary Injunction analysis, and while the question asks the parties to assume the opposite, Defendants offer limited comments that demonstrate a clear failure to satisfy the proof required for a preliminary injunction.

### A.   The ASUC and the Individual Defendant Members of the ASUC Are Not State Actors.

The ASUC is not a "state actor" and therefore did not violate any of DAAP's claimed constitutional rights.  A private party can only be found to have engaged in state action if "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Villegas v. Gilroy Garlic Festival Association,* 541 F.3d 950, 955 (2008) (citations omitted).  "Some of the factors to consider in determining whether there is a "close nexus" are: (1) the organization is mostly comprised of state institutions; (2) state officials dominate decision making of the organization; (3) the organization's funds are largely generated by the state institutions; and (4) the organization is acting in lieu of a traditional state actor." *Id.*

Here, the facts do not support a finding that the ASUC, or any of its individual members are state actors.  The organization is not mostly comprised of state institutions.  The ASUC is a non-profit, unincorporated association with 501(c)(3) status under federal law.  Klimek Decl., ¶ 4, Exh. A.  Further, the ASUC is independent of the University and governed by its own constitution and bylaws which do not require University input or

1    approval.  *Id.*

2         State officials do not dominate the decision making of the organization—as discussed

3    above, the ASUC is independent.  In section 4, subdivision A, ASUC's constitution states

4    that the ASUC "is fully independent and autonomous from the University of California,

5    Regents of the University of California and the Government of the State of California."  *Id.*

6    The ASUC's relationship with the University is further articulated in the Commercial

7    Activities and Student Services Agreement 2014 Revision, which states:

8              With respect to their role as the student government, the ASUC and
               (Graduate Assembly) have maximum operating and decision-
9              making discretion constrained only by the Chancellor's
               responsibility under the "University of California Policies Applying
10             to Campus Activities, Organizations, and Students," and his/her
               obligation to ensure overall fiscal soundness, a safe and healthy
11             environment, and fulfillment of all conditions outlined in specific
               agreements between the University and the ASUC/GA on the UCB
12             campus.

13        Further, the organization's funds are not largely generated by state institutions, but

14   are instead generated by the *students* themselves.  The Complaint concedes this fact: "The

15   majority of funding allocated to the ASUC for distribution to student organizations and for

16   student activities comes from a student activities fee established by the UC Regents and

17   allocated to the ASUC by the UC-Berkeley Chancellor." Complaint, ¶ 31.

18        Finally, the ASUC is not an organization acting in lieu of a traditional state actor.

19   The ASUC is a student government concerned with student government activity on campus.

20   None of its activities resemble anything that a traditional state actor would govern or

21   control.

22        The only authority cited in support of Plaintiffs' position that the ASUC is a state

23   actor is *Sellman v. Baruch College of City University of New York*, 482 F.Supp. 475

24   (S.D.N.Y. 1979). Dkt. No. 3 (Motion for TRO) at 3:4-5.  In that case, while the District

25   Court did find that a student government was a state actor, the Court rested its decision in

26   part on the fact that the student government branches "are advised and guided by faculty

27   members." *Id.* at 478.  In contrast, the ASUC, as articulated in its Constitution, is

28   independent and does not require advice and guidance by faculty members from the

1   University.  Klimek Decl., ¶ 4, Exh. B.

2     More important perhaps than any factual distinction between the instant case and that

3   of *Sellman* is the fact that the analysis of the state actor issue in *Sellman* has been

4   questioned.  In *Husain v. Springer*, 193 F.Supp.2d 664 (E.D. NY 2002), the Court found

5   that students who had participated in their student government and were sued in their

6   "individual and official" capacities were not state actors.  The plaintiffs in the case cited

7   *Sellman* to support their argument that because the Court had previously held that student

8   government associations could be state actors, so must be the individual members. *Husain*,

9   193 F.Supp.2d at 673.  The Court rejected Plaintiffs argument and found that case law

10  subsequent to *Sellman* required a different analysis.  In particular, the Court, citing *Leeds v.*

11  *Meltz*, 85 F.3d 51 (2d Cir. 1996), found that the correct analysis asks whether the state

12  exerted its "coercive power over, or provided significant encouragement to" the alleged

13  state actor. *Id.*

14    Here, the evidence shows that the ASUC is a non-profit, private organization and

15  cannot be described as a state actor.  Consequently, Plaintiffs' allegations that their

16  constitutional rights have been violated must fail.

  **B.**  **Even If the ASUC and Its Members Are State Actors, the Eleventh**
17        **Amendment Immunizes Them from This Suit in Federal Court.**

18

19    Even if the Court concludes that ASUC and the individual ASUC defendants are

20  California state actors, the ASUC defendants are immune from this suit in federal court

21  pursuant to the Eleventh Amendment of the United States Constitution.

22    The Eleventh Amendment provides:

23      The Judicial power of the United States shall not be construed to
    extend to any suit in law or equity, commenced or prosecuted
24      against one of the United States by Citizens of another State, or by
    Citizens or Subjects of any Foreign State.

25

26  U.S. Const. amend. XI.

27    Initially, the Eleventh Amendment applies to citizens suing their own state of

28  residence in federal court. *Hans v. Louisiana,* 134 U.S. 1 (1890).  In addition, it is well

1  established that claims under § 1983 are limited by the scope of the Eleventh Amendment.

2  *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70 (1989) (states or governmental

3  entities that are considered 'arms of the state' for Eleventh Amendment purposes" are not

4  "persons" under § 1983).  And a suit against a state official in his official capacity is no

5  different from a suit against the State itself. *Id.* at 71.  Thus, state officials sued in their

6  official capacities are not "persons" within the meaning of § 1983.[2]

7          There is only one exception to the general rule of Eleventh Amendment immunity in

8  federal court.  This exception involves federal court actions alleging constitutional

9  violations as a basis for prospective injunctive relief, commonly known as the *Ex parte*

10  *Young* doctrine. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997) (for

11  discussion of doctrine and application of the rule).  As explained by the U.S. Supreme

12  Court, plaintiffs who claim constitutional violations involving state organs must generally

13  seek their relief in the state courts, not federal court:

14          Interpretation of federal law is the proprietary concern of state, as
           well as federal, courts. It is the right and duty of the States, within
15          their own judiciaries, to interpret and to follow the Constitution
           and all laws enacted pursuant to it, subject to a litigant's right of
16          review in this Court in a proper case. The Constitution and laws of
           the United States are not a body of law external to the States,
17          acknowledged and enforced simply as a matter of comity. The
           Constitution is the basic law of the Nation, a law to which a
18          State's ties are no less intimate than those of the National
           Government itself. The separate States and the Government of the
19          United States are bound in the common cause of preserving the
           whole constitutional order. Federal and state law "together form
20          one system of jurisprudence." *Claflin v. Houseman*, 93 U. S. 130,
           137 (1876). It would be error coupled with irony were we to
21          bypass the Eleventh Amendment, which enacts a scheme
           solicitous of the States, on the sole rationale that state courts are
22          inadequate to enforce and interpret federal rights in every case.

23  *Id.* at 275-276.

24          The Ninth Circuit case of *Doe v. Lawrence Livermore Nat. Laboratory*, 131 F.3d 836

25  (1997), examined the application of the *Ex part Young* doctrine with regard to an employee

26  _____

27  [2] As to the individual ASUC defendants there are no factual allegations in the complaint supporting any notion that they
were acting other than in their official capacity.  Indeed, the decisions complained of in the complaint were not made by
28  any individual ASUC defendant but were made by separate ASUC bodies. *See, e.g.*, Complaint ¶¶ 62, 63 (complaining
of actions taken by "ASUC Elections Council" and "Judicial Council").

1    suing a University of California entity and alleging constitutional violations.  The remedies

2    sought in that case were back pay and reinstatement to employment going forward.  In

3    finding that the remedy of back pay was barred by the Eleventh Amendment but the

4    prospective relief of reinstatement was not, the Court explained the difference:

5                    . . . Doe's reinstatement would not serve as compensation for any
                     past harm, unlike a damages award. Reinstatement would not
6                    compensate Doe for lost wages or lost time working as a physicist
                     with the Laboratory. Rather, reinstatement would simply prevent
7                    the prospective violation of Doe's rights which would result from
                     denying him employment in the future. If Doe were reinstated,
8                    any salary received by him thereafter would have nothing to do
                     with the alleged past violation. Doe would be entitled to such
9                    salary solely for his work after reinstatement. Thus, while
                     reinstatement would relate to the past violation, it would not
10                   amount to relief solely for the past violation.

11   *Id.* at 841.  Here, the remedy sought in the complaint was for an alleged "past violation," the

12   purported constitutional violation caused by the failure to include the DAAP party

13   designation next to the names of the of the DAAP candidates on the ballot.  Further, the

14   injunctive relief sought, namely postponing the election (Complaint, p. 39:1-4) and making

15   the requested changes to the ballot, can no longer be provided as the election has taken place

16   and the damages relief sought is unquestionably barred by the Eleventh Amendment as

17   compensation for harm based on past conduct. Complaint, p. 39:5-11.

18          Accordingly, this Eleventh Amendment jurisprudence answers the Court's question

19   as to whether it has the power to order a new election.  It does not as that remedy would not

20   be for "prospective relief" but instead would be a "relief solely for the past violation," relief

21   that does not fall under the narrow exception of the *Ex parte Young* doctrine.

22          Simply put, to the extent that there is any colorable constitutional violation at issue in

23   this case, the relief sought is solely related to a singular past violation and thus any remedy

24   involves that "past violation."  Thus, as a matter of well-established constitutional

25   jurisprudence this entire action is barred by the Eleventh Amendment and cannot be

26   prosecuted in federal court.

27          Finally, based on these premises, there is no effective remedy that this Court could

28   enforce even in the unlikely event that a trial resulted in a finding of a constitutional

violation based on this occurrence.  Thus, the case is moot and should be dismissed on that ground as well.  *See Doe No. 1 v. Reed*, 697 F.3d 1235 (9th Cir. 2012) (dismissing First Amendment case as moot where names were released of individuals supporting Washington state referendum).

### C.    A Preliminary Injunction Analysis Weighs Heavily Against DAAP.

Defendants acknowledge the Court's guidance here, that the Court seeks answers to certain questions on the assumption that DAAP has met the prerequisites for a preliminary injunction.  However, we ask the Court's patience and consideration of the following brief comments on such an analysis.

A preliminary injunction is an extraordinary remedy never awarded as of right. *Munaf v. Geren,* 553 U.S. 674, 689-690 (2008).  And, a plaintiff seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Id.* Further, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. National Resources Defense Council, Inc.* 55 U.S. 7, 21 (2008).  Under this stringent standard there are no grounds for a preliminary injunction in this case as the following brief analysis highlights.

First, the evidence discussed herein does not come close to a showing that DAAP will succeed on the merits of this claim.

Second, there is no evidence of irreparable harm that will be avoided by ordering a new election.  The harm, to the extent that it exists, has already occurred although any finding of harm on this record requires reliance on a highly speculative proposition, namely that the ballot designation(s) in issue caused DAAP candidates, or any of them to lose the election.  ASUC has provided the election results.  Klimek Decl., ¶ 36, Exh. G.  The results demonstrate that thousands of votes were cast and that the Berkeley students rejected the

1    DAAP candidates by overwhelming margins.  These results are consistent with the

2    performance of the party in the recent past as well.  *Id*.  More importantly, all of the DAAP

3    affiliated candidates ran as affiliated candidates in every aspect of the campaign and election

4    other than on the ballot designation, and even on the ballot, all DAAP affiliated candidates

5    proclaimed their affiliation with DAAP by using the letters "DAAP" in their names. See

6    Shin Decl., ¶5, Exh. E.  Based on the election results, no reasonable inference exists that the

7    publication of the word "independent" on the ballot caused sufficient injury to any DAAP

8    candidate to justify the relief requested.

9         Third, the balance of the equities favors the Defendants here.  The evidence shows

10   that the Elections Council used the existence of neutral facts in deciding not to waive

11   DAAP's failure to comply with the applicable election rules.  *See generally*, Declaration of

12   Jonathan Morris in Support of Response. On the other side, DAAP, without so much as

13   acknowledging its own neglect, charges the Elections Council with engaging in "Southern

14   segregationist" style ballot discrimination.

15        Finally, the public interest element weighs heavily against DAAP here.  The "public"

16   in question is first and foremost the dozens of student candidates who worked and

17   campaigned tirelessly for student office in this election and the thousands of ASUC students

18   who cast votes for them.  It cannot be in the public interest to set aside that election on the

19   exceedingly thin evidence of harm to the DAAP candidates in issue here.  A new election

20   would likely be unfeasible in the spring semester as that term ends in mid-May.  More

21   importantly, a new election would deprive the winning candidates of office, without a shred

22   of evidence that the results would have been different if the DAAP candidates had been

23   identified as DAAP candidates in the designation column on the ballot.  In addition,

24   ordering a new election would invite tactics that might deprive the winning candidates of a

25   fair opportunity for election in the "new" election.  This is so because the results of the

26   election are now known and those results would impel losing parties to run candidates who

27   more closely match the views and personal characteristics of those who were fairly elected.

28   /////

**III.    QUESTION 3: SHOULD AN INJUNCTION BE LIMITED TO ASUC OR ITS OFFICERS?**

Answer: Yes, hypothetically.

As noted, the election was entirely the responsibility of the ASUC; hence any injunctive relief should be granted as to the ASUC exclusively.  There is no benefit and indeed no need to enjoin any of the individual members of the ASUC, as DAAP makes no allegations and offers no evidence suggesting that the harm to be avoided (a misnomer because the harm alleged to have occurred has already occurred and is therefore not a proper basis for prospective, provisional relief) was caused by individual conduct outside the course and scope of the individual actor's participation in the activity of the Association.

**IV.    QUESTION 4: IS AN EVIDENTIARY HEARING NECESSARY?**

Answer: No.

While Defendants are not hesitant to participate in an evidentiary hearing, the relevant facts in this matter are not truly in dispute.[3]  As noted above under Question 1, Plaintiff does not dispute that it failed to file the required party endorsement form on or before March 11 at 5p.  And there can be no legitimate dispute that the designation rule (ASUCBL 4204, section 4.4) constitutes a reasonable restriction on ballot access that facilitates orderly management of ballot designations.  In addition, DAAP cannot reasonably dispute that the rule (again ASUCBL 4204, section 4.4) is facially viewpoint neutral or that the burden it imposes on all parties is slight.  Indeed, in its petition to the Judicial Council, DAAP described waiver of the rule as waiver of a trivial technicality that could be rectified by "a few key strokes."  Klimek Decl., ¶ 25, Exh. D.  If those observations are true, then compliance with ASUCBL 4204 section 4.5 could also have been accomplished easily and cheaply and the designation required by section 4.4 could have been avoided.  In addition, DAAP cannot dispute that the appeals of CalSERVE and Danielle Miguel were based on viewpoint neutral facts and it has offered no evidence that tends to show otherwise.  Finally,

---

[3] Defendants of course have not had an opportunity to review and consider the position that Plaintiffs may take on this question and therefore respectfully request an opportunity to revisit this issue after review of Plaintiff's papers.

1  DAAP has not offered and will not be able to offer a scintilla of other evidence tending to

2  prove that the ASUC rejected DAAP's appeal because of one or more political viewpoints

3  espoused by DAAP or its candidates.

4  Based on these premises, it seems that there is little to be resolved by an evidentiary

5  hearing.  Defendants will testify in accord with the articulated evidence and, presumably,

6  DAAP will continue to assert that the Elections Council is a modern day, collegiate proxy

7  for the disgusting attitudes and violence cultivated and purveyed by "Southern

8  segregationists," past and present.  It is hard to see any real benefit to be derived from the

9  testimony of Defendants that such accusations are outrageous and untrue.  In the interest of

10  judicial economy, Defense Counsel is prepared to make that very offer of proof in open

11  court if the Court requests it.  The remaining issues, such as state action, application of the

12  Eleventh Amendment and an appropriate remedy are mainly questions of law.

13  Finally, the Defendants are students; they will be preparing for finals during the week

14  of May 5th (dead week) and an evidentiary hearing and the preparation that it will require

15  will constitute a significant obstacle to success on their upcoming academic final exams.

16  **V.    CONCLUSION**

17  Based on the premises set forth above, Defendants respectfully submit that the Order

18  to Show Cause should be denied.

19  DATED:  April 15, 2016                    ELLENBERG & HULL

20

21

22                                  BY:  _____/s/ Steven A. Ellenberg_____
                                        STEVEN A. ELLENBERG
23                                      Attorneys for Defendant Associated
                                        Students of the University of California
24                                      (ASUC)

25

26

27

28